# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. No. 18-75-LPS |
| RYAN BACON, MICHAEL PRITCHETT, DION OLIVER, MAURICE COOPER, and TERES TINNIN, | |
| Defendants. | |

David C. Weiss, Maureen McCartney, Jesse S. Wenger, and Christopher L. de Barrena-Sarobe, U.S. ATTORNEY'S OFFICE, DISTRICT OF DELAWARE, Wilmington, DE

> Attorneys for United States

Edson A. Bostic, THE BOSTIC LAW FIRM, Philadelphia, PA

Conor Wilson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Wilmington, DE

> Attorneys for Defendant Bacon

José Luis Ongay, LAW OFFICES OF JOSÉ LUIS ONGAY, Plymouth Meeting, PA

> Attorney for Defendant Pritchett

Michael N. Huff, LAW OFFICES OF MICHAEL N. HUFF, Philadelphia, PA

> Attorney for Defendant Oliver

Luis A. Ortiz, LAW OFFICES OF LUIS A. ORTIZ, Philadelphia, PA

> Attorney for Defendant Cooper

Christopher G. Furlong, LAW OFFICES OF CHRISTOPHER G. FURLONG, Media, PA

> Attorney for Defendant Tinnin

---

## MEMORANDUM OPINION

November 1, 2021
Wilmington, Delaware

**STARK, U.S. District Judge:**

Defendants Ryan Bacon, Michael Pritchett, Dion Oliver, Maurice Cooper, and Teres Tinnin (collectively, "Defendants") were indicted on multiple criminal charges. Specifically, all five Defendants are charged with (i) conspiracy to stalk, in violation of 18 U.S.C. § 371 ("Count One"); (ii) stalking, in violation of 18 U.S.C. § 2261A(2)(A) ("Count Two"); (iii) conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(a) & (c) ("Count Three"); and (iv) use and/or carrying of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Five"). Additionally, Bacon, Pritchett, Oliver, and Cooper are charged with kidnapping, in violation of 18 U.S.C. § 1201(a)(1) & (2) ("Count Four"). (*See generally* D.I. 106)

Defendants filed a variety of pretrial motions. Pritchett moves to suppress evidence obtained from two cellphones (D.I. 169) and to exclude videos from his Snapchat account (D.I. 170). Bacon similarly requests that the Court exclude audio and video recordings of his rap music. (D.I. 184) Tinnin asks the Court to suppress evidence obtained from a search of his apartment. (D.I. 173) Oliver moves to suppress cell site location information, pen register and trap and trace ("PRTT") information, and physical evidence obtained pursuant to allegedly faulty court orders and search warrants. (D.I. 171, 187) Moreover, Oliver seeks to dismiss the firearms charge (Count Five) on the grounds that the predicate offense, stalking (in violation of 18 U.S.C. § 2261A(2)(A)), does not qualify as a "crime of violence" within the meaning of 18 U.S.C. § 924(c)(3)(A). (D.I. 171) Tinnin wants to sever his trial from the trial for the other four defendants. (D.I. 172) Pritchett, Tinnin, and Bacon all request early notice of any evidence that the government must disclose under Federal Rule of Evidence 404(b). (D.I. 168,

175, 178)   Finally, each defendant seeks to join the motions of the other defendants.   (D.I. 167, 171, 174, 176, 177, 186)

For the reasons explained below, the Court will: (i) deny as moot Tinnin's motion to suppress, (ii) deny the remaining motions to suppress, (iii) hold the motions to exclude in abeyance so that the government may respond in accordance with the schedule for motions *in limine*, (iv) deny Oliver's motion to dismiss Count Five, (v) deny Tinnin's motion for severance, (vi) deny as moot the motions regarding Rule 404(b) evidence, and (vii) grant in part and deny in part Defendants' motions to join.

## BACKGROUND[1]

Defendants Ryan Bacon, Michael Pritchett, Dion Oliver, Maurice Cooper, and Teres Tinnin have known each other for many years, and they have also associated with Dontae Sykes. In 2014, Bacon (under the name "Buck 50") released a rap video in which he was standing next to Oliver and Tinnin.   As part of the song, Bacon called another individual, Markevis Stanford, a "rat."   Later that year, Oliver was shot, and he told a friend it was Stanford's fault.

Several years later, in April 2017, tensions between Defendants and Stanford resurfaced when Bacon released another rap song called "Conversations with Pac."   This song, too, referred to a "rat," evidently in reference to Stanford.

---

[1] This background is based on the Statement of the Case and the Procedural History in the government's omnibus response to Defendants' pretrial motions.   (*See generally* D.I. 189 at 2-11)   It is consistent with what the second superseding indictment alleges and what the government intends to prove at trial.   With the limited exception of the portion of Pritchett's motion to suppress, on which the Court heard testimony at the hearing (*see infra* Section I.A), the Court agrees with the government that there are no factual disputes the Court needs to resolve (or does resolve) in ruling on the pending motions.   (*See* D.I. 189 at 2)

Shortly thereafter, Stanford and a friend saw Bacon driving around Wilmington, Delaware.   Stanford offered his friend $10,000 if he killed Bacon, and Stanford gave him a gun and a mask.   When Stanford's friend tried to kill Bacon, the gun failed to work, so he was unsuccessful.

In May 2017, Stanford and his friend saw Pritchett and Tinnin on a Wilmington street and stole money and jewelry from them.   Pritchett and Tinnin alerted Bacon, Oliver, Cooper, Sykes, and others about the robbery, and the group talked about increasing the size of a reward for killing Stanford or for information leading to Stanford's death.

About a week later, Cooper saw Stanford and his friend walking on the street and shot at them multiple times.   Stanford and his friend shot back.   After the shooting, a local bail bondsman told Bacon and Oliver that they could use a database to see whether Stanford was in custody as a result of the shooting.   Stanford was in custody at the state correctional institution at the time, but he posted bail and was released at the beginning of June.

A few days after Stanford's release, Pritchett learned that Stanford was probably staying with his girlfriend, Keyonna Perkins, in Newark, Delaware.   During the night of June 5-6, 2017, Pritchett called the other defendants and Sykes to tell them what he had learned.   Early in the morning, Pritchett and Sykes swapped their vehicles for their respective girlfriends' cars.

By 8:00 a.m. that morning, Bacon, Pritchett, Oliver, Cooper, and Sykes had gathered by Perkins' apartment.   Tinnin was not with them; he was nearby at his own apartment in Newark. Bacon, Pritchett, Oliver, Cooper, and Sykes waited in their cars by Perkins' red Camaro, which they knew Stanford often drove.

After a few hours of waiting, Bacon, Pritchett, Oliver, Cooper, and Sykes saw Perkins get

3

into her car.   They followed her to a local fast food restaurant and back to her apartment complex.   When she exited her vehicle, Oliver approached her with a gun, told her to get back into her car, and demanded that she give him her apartments keys and cellphone.   Oliver gave the keys to the others, who went to search for Stanford in Perkins' apartment.   Text messages were also sent from Perkins' phone in an attempt to locate Stanford.

Around 11:40 a.m., Stanford responded that he was by the intersection of Routes 896 and 40 in Newark.   Tinnin, who had since left his apartment, also called Pritchett to let him know that he (Tinnin) had seen Stanford walking on Route 896.   Bacon, Pritchett, Oliver, Cooper, and Sykes forced Perkins to get in the trunk of one of their cars, and they all drove toward Stanford.

About ten minutes later, the group found Stanford walking along Route 896.   They pulled over to the side of the road, and multiple group members shot at him.   Stanford was not hit.   Tinnin called the group to tell them that Stanford was unharmed.

Bacon, Pritchett, Oliver, Cooper, and Sykes drove both cars to a church parking lot, where they blindfolded Perkins and forced her to get into the trunk of the other car.   Bacon and Sykes took her to Elkton, Maryland.   After driving down a gravel road into a wooded area, they fatally shot Perkins five times.

Pritchett and Oliver returned Pritchett's girlfriend's car to her, and Pritchett took back his distinctive white pickup truck with red racing stripes.   Pritchett, Oliver, and Cooper then traveled back to Wilmington.

A couple of hours later, Defendants learned that Stanford had been seen by the probation and parole office in New Castle, Delaware.   At about 2:00 p.m., Pritchett and Oliver saw Stanford get into a car there and followed him as he rode to Wilmington.

Around 2:30 p.m., Stanford exited the car by 6th and Spruce Streets in Wilmington. Oliver shot at Stanford multiple times from Pritchett's truck. Oliver's shots did not hit Stanford, but one hit the head of a six-year-old boy riding in a nearby vehicle. The boy survived, but is now permanently disabled.

The next day, Bacon, Pritchett, Oliver, Tinnin, and Sykes gathered at Tinnin's apartment in Newark to discuss a plan to hide Pritchett's truck and to dispose of the guns that were involved in the shootings on Route 896 and at 6th and Spruce Streets. The guns were hidden in a wooden area close to Tinnin's apartment.

That afternoon, Pritchett drove his truck toward Seaford, Delaware, while Oliver and Sykes followed him. About an hour into the drive, the police stopped Pritchett's truck and arrested him. During the arrest, the police seized one phone from Pritchett and another phone from his truck.

State and federal law enforcement started investigating. As part of their investigations, law enforcement sought and received various court orders and search warrants. Some court orders permitted law enforcement to obtain historical cell site location information ("CSLI") for Defendants' phones.

As a result of the state investigation, the State of Delaware brought racketeering and other charges against all Defendants and Sykes in 2017 and 2018. Pritchett was already in state custody for his role in the shooting at 6th and Spruce Streets, and Cooper was already in state custody for firearms charges. Bacon, Tinnin, and Oliver were not in custody at that time; they were apprehended in Atlanta, Georgia in August 2018.

On October 4, 2018, a grand jury in the District of Delaware indicted Defendants and

Sykes on multiple counts related to the shootings and Perkins' kidnapping.   (D.I. 3)   A few months later, a grand jury returned a superseding indictment, which added a firearms charge against all Defendants and Sykes.   (D.I. 61)   Sykes pleaded guilty to the charges against him. (D.I. 98)   In March 2020, a grand jury returned a second superseding indictment, which omitted Sykes and added a charge for Tinnin.   (D.I. 106)

Between April and June 2021, Defendants filed various pretrial motions.   Having carefully considered all the briefing and related materials (D.I. 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 184, 185, 186, 187, 189, 199, 202), the Court conducted an evidentiary hearing and heard oral argument on the pretrial motions on August 3, 2021.   (D.I. 212) ("Tr.")

## LEGAL STANDARDS

### I.    Motion to Suppress

The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourth Amendment also directs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   *See also* Fed. R. Crim. P. 41(d).   In determining whether probable cause exists, a judge need only "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."   *Illinois v. Gates*, 462 U.S. 213, 238 (1983).   When probable cause is later challenged, "[t]he role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the [judge who issued the search

6

warrant] had a substantial basis for concluding that probable cause existed.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 238); *see also United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005) ("[T]he conclusions of a neutral [judge] regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided.").

If the government seeks to admit evidence that it collected pursuant to an illegal search or seizure, the "exclusionary rule" may result in the suppression of that evidence, making it unavailable at trial. *United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (en banc) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure" as well as "evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (internal quotation marks omitted). "The exclusionary rule is designed to deter police conduct that violates the constitutional rights of citizens," including violations of the Fourth Amendment. *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002).

Even if a search is unlawful, the "extreme sanction" of excluding evidence is not necessarily appropriate. *United States v. Leon*, 468 U.S. 897, 926 (1984); *see also Katzin*, 769 F.3d at 170 ("Whether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual's Fourth Amendment rights."). For instance, the good faith exception to the exclusionary rule "instructs that suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *Zimmerman*, 277 F.3d at 436 (internal quotation marks omitted); *see also*

7

*Leon*, 468 U.S. at 922 n.23 (noting that good faith inquiry "is confined to the objectively ascertainable question [of] whether a reasonably well trained officer would have known that the search was illegal despite the [judge]'s authorization").

## II.     Motion for Severance

Federal Rule of Criminal Procedure 14 gives the Court discretion to sever a defendant's trial if "consolidation for trial appears to prejudice" the defendant.   *See also United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) ("Whether to sever a trial is left to the sound discretion of the district courts.").   Notwithstanding the Court's discretion, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together."   *Zafiro v. United States*, 506 U.S. 534, 537 (1993).   Hence, a defendant bears "a heavy burden in gaining severance." *United States v. Quintero*, 38 F.3d 1317, 1343 (3d Cir. 1994).   "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."   *United States v. Shabazz*, 319 F. App'x 127, 130 (3d Cir. 2009) (internal quotation marks omitted); *see also United States v. Gorecki*, 813 F.2d 40, 43 (3d Cir. 1987) (noting that Rule 14 is "stringent" in requiring a showing of prejudice).

## DISCUSSION

## I.     Motions to Suppress

### A.     Pritchett

Pritchett moves to suppress evidence from a cellphone with the number (302) 415-5088 (the "-5088 phone") and another cellphone with the number (302) 257-9818 (the "-9818 phone"). (D.I. 169)   Pritchett's motion consists of three parts: (i) Pritchett argues that his phones were

8

illegally searched on July 13, 2017, when law enforcement recorded videos from his Snapchat account (*see* D.I. 199 at 2-6); (ii) Pritchett maintains that warrants obtained in July 2017 were defective (*see id.* at 6-7); and (iii) Pritchett contends that the police unlawfully searched his phones by removing their subscriber identity module ("SIM") cards without a warrant (*see id.* at 7-10).

The first two portions of Pritchett's motion are premised on a misunderstanding.   During discovery, the government produced a July 13, 2017 recording of Detective Jones from the Wilmington Police Department viewing many videos that were saved to Pritchett's Snapchat account.   (D.I. 179)   Based on the video, Pritchett believed that the police had access to his phone on July 13, 2017.   Looking at the universe of search warrants in existence at that time, Pritchett assumed that the police had obtained warrants to search his phones that same day.   (*See generally* D.I. 169-1, 169-2)

In fact, however, after the police seized Pritchett's phones during his arrest on June 7, 2017, the phones were given to Detective Lenhardt.   (D.I. 189-9 at #1014)   Detective Lenhardt removed the phones' SIM cards so that he could obtain the relevant international mobile subscriber identity ("IMSI") numbers and phone numbers.   (D.I. 189 at 45)   Detective Lenhardt gave that information to Detective Jones and told him that the phones could not be accessed because they were locked with passcodes.   (D.I. 189-9 at #1014)   In November 2017, the police obtained a warrant and sent the -9818 phone to a company called Cellebrite, which has technology to access locked phones.   (*See generally* D.I. 189-9)   In January 2018, Cellebrite returned the -9818 phone to the police along with its passcode.   (D.I. 189-10 at #1025)   The passcode that Cellebrite provided unlocked both phones, allowing the police to review the

contents of both phones.   (D.I. 189-12 at #1045)   Later on the same day he heard from

Cellbrite, Detective Jones obtained two warrants, permitting a search of both the -9818

and -5088 phones.   (*See generally* D.I. 189-10, 189-11)

At the hearing, Detective Jones testified that on July 13, 2017, Pritchett's phones were

still inaccessible, so he did not view the Snapchat videos ***on Pritchett's phone*** when he made the

July 13, 2017 recording.   (Tr. at 33)   Instead, he had obtained a separate warrant for Pritchett's

Snapchat account, and then used Pritchett's credentials to access Pritchett's Snapchat account ***on***

***Detective Jones' own phone*** (issued to him by the Wilmington Police Department).   (*Id.* at 29-

30)   Based on that testimony, Pritchett withdrew the first portion of his motion.   (*Id.* at 41)

("We will not be able to pursue at this point the argument that the phone was searched without a

warrant to access the Snapchat.")   The Court need not further address that argument.

In the second portion of his motion, Pritchett argues that the July 2017 warrants were

defective because they authorized the police to search certain telephone account records, not

Pritchett's phones.   (*See* D.I. 199 at 6-7)   As explained above, the police did not rely on those

warrants to search Pritchett's phones because they did not have access to the phones at that time.

Rather, the police relied on two warrants that they obtained in January 2018, after Cellebrite

determined the passcode for the -9818 phone.   (*See generally* D.I. 189-10, 189-11)[2]

---

[2] Pritchett also contends that the July 2017 warrants are defective because the supporting affidavits "do not contain evidence of the criminal activity that that will be found in the [specified] telephone account records."   (D.I. 199 at 6)   Below, the Court concludes that the government inevitably would have discovered the telephone account records.   Given that conclusion, the Court need not address Pritchett's additional challenges to the July 2017 warrants.

In the third and final portion of his motion, Pritchett argues that evidence from his phones and telephone account records should be suppressed because the police illegally searched his phones when they removed the SIM cards. (D.I. 199 at 7-10) In the government's view, regardless of whether there was an unlawful search, the government still would have obtained the contents of the phones and the telephone account records. (D.I. 189 at 47-54) The Court agrees with the government on this point.

Even assuming (without deciding) that the removal of the SIM cards from Pritchett's phones qualifies as a search under the Fourth Amendment, suppression is not warranted.[3] It is true that the affidavits supporting the search warrant applications contained Pritchett's phone numbers, which Detective Lenhardt had extracted from the phones' SIM cards without any legal process. (D.I. 189-10 at #1024; D.I. 189-11 at #1034) However, even if the phone numbers were stricken from the affidavits, a neutral judge still would have issued the warrants because they were supported by probable cause that Pritchett's phones would contain evidence of the crimes specified in the affidavit, regardless of the associated phone numbers. *See United States v. Herrold*, 962 F.2d 1131, 1138 (3d Cir. 1992) ("[E]ven assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant [that] is otherwise validly issued upon probable cause reflected in the affidavit."). As the government correctly explains, the affidavits

---

[3] The government does not concede that the removal of the SIM cards amounts to a search under the Fourth Amendment because, in the government's view, SIM cards contain only identifying information, not detailed information about the phone's owner. (*See* D.I. 189 at 48 n.12) (citing *Riley v. California*, 573 U.S. 373, 396 (2014)) Moreover, courts have held that the removal of a phone's battery is not a search under the Fourth Amendment. *See, e.g.*, *Ward v. Lee*, 2020 WL 6784195, at *8 (E.D.N.Y. Nov. 18, 2020) ("[O]fficers may legally open the battery pack of a phone to view its serial number."). The instant case does not require the Court to decide this issue.

established probable cause, based on the following:

> (i) a truck known to be operated by Defendant Pritchett was caught on camera taking part in a shooting, (ii) eyewitnesses and a shooting victim identified shots being fired from the white truck caught on the surveillance video, (iii) Defendant Pritchett was alone driving that same truck when arrested the day following the shooting, (iv) the searched phones were either found on Defendant Pritchett's person or on the driver's seat of the truck, and (v) Detective Jones' training and experience detailing why evidence of the crime of attempted first degree murder could be found on the Pritchett Phones.

(D.I. 189 at 50)   Because the phone numbers were not necessary to establish the probable cause required to obtain warrants to search Pritchett's phones, the Court will not suppress any evidence from the phones.

Nor will the Court suppress the related telephone account records.   The "inevitable discovery doctrine" permits the government to use evidence obtained through an unlawful search when the government shows it is more likely than not that "the information ultimately or inevitably would have been discovered by lawful means."   *Nix v. Williams*, 467 U.S. 431, 444 (1984).   Here, there is no doubt that the government would have obtained the complete telephone account records after lawful searches of Pritchett's phones.   Searching the phones would have revealed their phone numbers.   Indeed, the government did confirm the phone numbers when it was able to unlock the phones in January 2018.   (*See* D.I. 189 at 53)   Once law enforcement had the phone numbers, they would have inevitably sought the associated telephone account records.   Again, that is precisely what happened when the police sought court orders and search warrants to obtain the -5088 telephone account records.   (*See generally* D.I. 189-14, 189-15, 189-19, 189-28, 189-29)   The Court is persuaded that the government has met

its burden to show that it inevitably would have obtained the telephone account records, even if it had never removed the SIM cards from Pritchett's phones.   Thus, the Court will not suppress the telephone account records.

Accordingly, Pritchett's motion to suppress will be denied.

### B.     Oliver

#### 1.     Cell Site Location Information

Oliver first asks that the Court suppress his historical CSLI because the government should have obtained search warrants to gain access to that information.   (D.I. 171 at 12-14)   Instead, between June 21, 2017 and June 14, 2018, the government obtained court orders under § 2703(d) of the Stored Communications Act ("SCA") to access Oliver's historical CSLI.   (*See generally* D.I. 171 Exs. A-F)   At the time the government did so, Third Circuit precedent permitted collection of historical CSLI pursuant to § 2703(d) orders.   *See In re Application of U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Record to Gov't* ("*In re Application*"), 620 F.3d 304, 313 (3d Cir. 2010).   Then, on June 22, 2018, shortly after law enforcement obtained the last relevant § 2703(d) order in the instant case, the Supreme Court held that the government must have a search warrant supported by probable cause before collecting historical CSLI.   *See Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

"Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."   *Davis v. United States*, 564 U.S. 229, 241 (2011)).   In this case, at all relevant times, binding precedent (*In re Application*) authorized the government's practice of collecting historical CSLI pursuant to § 2703(d) orders.   Thus, the good faith exception applies and prevents the suppression of historical CSLI obtained pursuant to

13

§ 2703(d) orders before the Supreme Court decided *Carpenter*.   *See United States v. Goldstein*, 914 F.3d 200, 204 (2019).

It does not matter that the Supreme Court had granted certiorari in *Carpenter* before the government obtained the disputed § 2703(d) orders.   "The government could not have predicted the outcome of *Carpenter* . . . from two [prior] Supreme Court cases that the Supreme Court itself said are not directly applicable."   *Id.* at 205; *see also United States v. Ramirez*, 471 F. Supp. 3d 354, 366 n.12 (D. Mass. 2020) ("[T]he grant of certiorari has no effect on the Government's good faith reliance.").   Thus, the good faith exception applies here.

Oliver next asks that the Court suppress information obtained from "tower dumps," which involve collecting cell site information for all phones connecting to a particular cell tower during a particular period.   (D.I. 171 at 14-19)   Specifically, the government obtained three § 2703(d) orders requiring four cellular service providers to disclose records about "all communications made using" cell towers servicing certain street addresses during certain time windows.   (*E.g.*, D.I. 171 Ex. A at #468)

In *Carpenter*, the Supreme Court declined to decide whether a tower dump is a search under the Fourth Amendment.   *See* 138 S. Ct. at 2220.   For purposes of this case, the Court will assume, without deciding, that a tower dump amounts to a search.   As already noted, even when a search is unlawful, "the good faith exception applies when a search is executed pursuant to a statute that was valid at the time of the search but later declared unconstitutional."   *Goldstein*, 914 F.3d at 204 (citing *Illinois v. Krull*, 480 U.S. 340 (1987)).   Similarly, "the exclusionary rule will not apply when law enforcement conducts a search pursuant to a judicial order later found invalid."   *Id.* (citing *United States v. Leon*, 468 U.S. 897 (1984)).   Here, the government

14

obtained tower dumps pursuant to § 2703(d) orders.   (*See generally* D.I. 171 Exs. A, B & E)
Law enforcement had used this investigative technique for many years, and the government's
reliance on it during the relevant period in this case was justified.

Oliver has not cited any case holding that § 2703(d) does not permit tower dumps.   To
the contrary, courts that have considered the issue have come out the other way.   *See, e.g.*, *In re
Application for Cell Tower Records Under 18 U.S.C. § 2703(d)*, 90 F. Supp. 3d 673, 676-77
(S.D. Tex. 2015).   Nor has Oliver articulated any persuasive reasons why § 2703(d) is obviously
unconstitutional or otherwise faulty.[4]   Thus, the good faith exception applies, and the Court will
not suppress the evidence obtained in the tower dumps.

Accordingly, Oliver's motion to suppress historical CSLI and information obtained from
tower dumps will be denied.

### 2.    Pen Register and Trap and Trace Information

Oliver also seeks to suppress pen register and trap and trace information obtained
pursuant to three § 2703 orders.   (*See generally* D.I. 171 Exs. D & G; D.I. 187 Ex. M)
According to Oliver, the applications for those orders "lacked specific and articulable facts
showing that there were reasonable grounds to believe [he] was involved in criminal activity."
(D.I. 171 at 19; *see also* D.I. 187 at 10)

Oliver's motion fails because suppression is not an available remedy for violations of the
Stored Communications Act.   Instead, the SCA specifies three possible remedies for
nonconstitutional violations: (i) preliminary, equitable, or declaratory relief, (ii) damages, and

---

[4] Contrary to Oliver's argument (*see* D.I. 171 at 17-19), § 2703(d) orders are not
unconstitutional "all persons" warrants.   *See, e.g.*, *United States v. Pembrook*, 876 F.3d 812,
823-24 (6th Cir. 2017) (rejecting similar "general warrant" argument for tower dumps).

15

(iii) attorney fees and costs. 18 U.S.C. § 2707(b). These are "the *only* judicial remedies . . . for nonconstitutional violations" of the SCA. *Id.* § 2708 (emphasis added). Because Oliver does not assert a constitutional violation, suppression is not an available remedy. *See, e.g., United States v. Powell*, 444 F. App'x 517, 520 (3d Cir. 2011); *see also United States v. Jones*, 908 F. Supp. 2d 203, 209 (D.D.C. 2012) ("[A]ll courts that have addressed the issue have held that the SCA does not provide for a suppression remedy.").

Even if suppression were an available remedy, Oliver's arguments are unpersuasive. The applications for the PRTT orders contained specific allegations regarding Oliver's involvement in criminal activity. For example, the application that sought information regarding phone number (302) 480-0090 (the "-0090 number") explained that Oliver was allegedly involved in distributing large quantities of heroin and was in contact with Bacon and Tinnin using the -0090 number. (D.I. 171 Ex. D ¶ 3(a), (f)) Additionally, the application that sought information regarding Oliver's Instagram account detailed how phone records showed that Oliver left Delaware the day after he was indicted for the shooting at 6th and Spruce Streets. (D.I. 187 Ex. M ¶ 3(a)) It further detailed how law enforcement located Oliver's Instagram page in an effort to learn Oliver's whereabouts because fugitives often use Instagram as a way to communicate without creating public records. (*Id.* ¶ 3(b)-(m)) The application that sought information about phone number (504) 335-5587 (the "-5587 number") contained similar allegations about how Oliver remained at large after his indictment and used the -5587 number to log in to his Instagram account. (D.I. 171 Ex. G ¶ 3) The facts presented in all three applications are specifically tied to Oliver's alleged criminal activity, and the corresponding § 2703 orders are not defective.

16

Accordingly, Oliver's motion to suppress PRTT information will be denied.

### 3.    Physical Evidence

Oliver further seeks to suppress evidence obtained pursuant to five different search warrants.   (D.I. 171 at 22-27; D.I. 187 at 5-9)   Oliver has failed to show that the judges who signed the warrants did not have a "'substantial basis'" for doing so.   *Stearn*, 597 F.3d at 554 (quoting *Gates*, 462 U.S. at 238).   Even if the warrants were defective in some respect, the good faith exception would prevent the exclusion of evidence obtained pursuant to those warrants.

First, Oliver challenges a search warrant that authorized disclosure of prospective location information for a certain T-Mobile device.   (*See generally* D.I. 171 Ex. H)   That application contained specific facts about how Oliver left Delaware for North Carolina after learning he had been indicted for the shooting at 6th and Spruce Streets.   (*Id.* ¶¶ 4, 8)   It also explained that Oliver disabled a known cellphone number.   (*Id.* ¶ 9)   Those allegations are sufficient to establish probable cause that Oliver fled in an attempt to avoid prosecution, in violation of 18 U.S.C. § 1073.

Oliver also argues that a search warrant for records associated with phone number (302) 268-2629 ("the -2629 number") lacked probable cause.   (*See generally* D.I. 187 Ex. L)   That argument fails for similar reasons.   The supporting affidavit explained that law enforcement tied Oliver to the -2629 number by doing an analysis of toll records, which revealed extensive interactions with Oliver's girlfriend and repeated interactions with Bacon and Tinnin.   (*Id.* ¶¶ 11-12)   The supporting affidavit also contained specific allegations that a truck Oliver was known to drive "quickly left" for Camden, New Jersey shortly after his indictment became public.   (*Id.* ¶¶ 7-10)   Those factual averments are adequate to support a showing of probable

17

cause.

Similarly, Oliver challenges a search warrant for information related to the -0090 number. (*See generally* D.I. 171 Ex. I)   Oliver claims that the warrant lacked probable cause and was overly broad because it did not establish that Oliver was connected to an attempt to harm Stanford in prison.   (D.I. 171 at 26)   The application for the warrant included many details regarding the events leading up to June 6, 2017 and the conspiracy to kill Stanford.   (*See* D.I. 171 Ex. I ¶¶ 11-35)   It explained that the conspiracy continued after the shootings and after Stanford was incarcerated for unrelated offenses.   (*Id.* ¶¶ 36-37)   Those allegations are sufficient to establish probable cause because it is reasonable to infer that Oliver's connection with the conspiracy did not abruptly end on June 6, 2017.   Law enforcement was not required to have direct knowledge of Oliver's involvement with the prison plot.   *See United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) ("[I]t is well established that direct evidence is not required for the issuance of a search warrant.").

Oliver contends that a search warrant for his black iPhone was unsupported by probable cause and lacked particularity.   (*See generally* D.I. 171 Ex. J)   In fact, however, the warrant was supported by probable cause.   The supporting affidavit explained that Oliver (also known as "Sadizwakil Aleem") and other defendants were "active participants" in schemes involving drug trafficking and witness intimidation.   (*Id.* ¶ 8)   For instance, the affidavit states that Oliver and other defendants "routinely use[d] cellular phones" and "maintain[ed] multiple phones to facilitate the drug trade, the money laundering schemes, and to avoid detection by law enforcement."   (*Id.* ¶¶ 8-9)   The warrant was particularized, identifying the specific black iPhone to be searched.

Oliver asserts that a search warrant for an Apple account associated with his email address was improper.  (*See generally* D.I. 171 Ex. K)   In Oliver's view, the warrant was overbroad because it sought the contents of all messages and other files in his Apple account. (D.I. 171 at 27)   Oliver does not accurately portray the scope of the warrant.   Although Section I of Attachment B required that the provider disclose "[a]ll records or other information" and the "contents of all emails" (D.I. 171 Ex. K at #622-23), Section II limited the evidence to be seized by the government to "[a]ll information described above in Section I that constitutes evidence or fruit or instrumentalities" of the charged crimes "involving Dion Oliver" (*id.* at #625).   Other courts have upheld similar warrants that limit the government's seizure to only some information that must be disclosed.   *See, e.g.*, *United States v. Cariani*, 2019 WL 5085418, at *5 (D. Nev. Oct. 10, 2019) (rejecting overbreadth argument because defendant "confuse[d] the difference between disclosure and seizure").   This Court will do the same.

Finally, even if any of the warrants were deficient in some respect, suppression still would not be appropriate.   Under the good faith exception, evidence generally should not be excluded "when law enforcement conduct[ed] a search pursuant to a judicial order." *Goldstein*, 914 F.3d at 204.   Exclusion would be appropriate only if: (i) the judge "issued the warrant in reliance on a deliberately or recklessly false affidavit," (ii) the judge "abandoned his or her judicial role and failed to perform his or her neutral and detached function," (iii) "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (iv) "the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).   There are no obvious deficiencies with the warrants Oliver

19

challenges or their supporting affidavits.   Nor does the record reveal any basis to find that the issuing judges failed to perform their jobs or based their decisions on erroneous affidavits. Thus, excluding evidence would not be appropriate for any of the five warrants.

Accordingly, Oliver's motion to suppress physical evidence will be denied.

### C.     Tinnin

Tinnin moves to suppress evidence obtained from his apartment in Newark pursuant to a January 2018 search warrant.   (D.I. 173 at 1)   Tinnin argues that the warrant was overly broad, obtained too late, and lacked any nexus to the charged crimes.   (*Id.* at 2)   The government has represented that it will not seek to "admit any of the evidence seized from, or derived from, the January 2018 search" of Tinnin's apartment.   (D.I. 189 at 55)   During the hearing, Tinnin confirmed that he is comfortable with the government's representation.   (Tr. at 61) Accordingly, the Court will deny Tinnin's motion to suppress as moot.

## II.     Pritchett's and Bacon's Motions to Exclude

Pritchett seeks "an Order excluding and limiting the admissibility of certain evidence," including video recordings from his Snapchat account and any evidence regarding efforts by Dwayne White to communicate with the six-year-old victim's family.   (D.I. 170 at 1-2) Similarly, Bacon filed a motion to exclude "lyrics from his rap music in any form."   (D.I. 184 at 1)   As the government points out, these motions are fairly characterized as motions *in limine*. Under the governing scheduling order, briefing on motions *in limine* is not due to be completed until December 2021.   (D.I. 203 ¶ 4)   During the hearing, Bacon and Pritchett agreed that their motions to exclude could be handled at the same time as any other motions *in limine*.   (Tr. at 62) Accordingly, the Court will hold the motions to exclude in abeyance, and the government will be

obligated to respond to them on or before the December 10, 2021 deadline set in the scheduling order.

### III.  Oliver's Motion to Dismiss Count Five

Oliver moves to dismiss Count Five of the second superseding indictment.   (D.I. 171 at 27-31)   Count Five charges Defendants with using and/or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and 2.   (D.I. 106 at 17-18)   That statute provides that individuals who possess, brandish, or discharge firearms while committing crimes of violence are subject to increased penalties:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any *crime of violence* or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such *crime of violence* or drug trafficking crime –
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A) (emphasis added).   The statute further defines a "crime of violence" as any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."   *Id.* § 924(c)(3)(A).   This definition is known as the

"elements clause."[5]  "Physical force" means "violent force – that is, force capable of causing

physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010)

(emphasis omitted).

To determine whether an offense is a "crime of violence" under the elements clause,

courts undertake an analysis known as the "categorical approach."   Under the categorical

approach, "courts may look only to the statutory definitions – *i.e.*, the elements – of a defendant's

[predicate] offenses, and *not* to the particular facts" of the defendant's charges.  *Descamps v.*

*United States*, 570 U.S. 254, 261 (2013).   That is, courts "look to the elements of the [predicate]

offense to ascertain the least culpable conduct hypothetically necessary to sustain a conviction

under the statute."  *United States v. Dahl*, 833 F.3d 345, 350 (3d Cir. 2016) (internal quotation

marks omitted).   When a statute is "divisible," meaning that it establishes alternative versions of

the crime, courts apply a "modified categorical approach" in which they are permitted to

"examine a limited class of documents," including the charging documents, "to determine which

of a statute's alternative elements form[s] the basis" for the predicate offense.  *Descamps*, 570

U.S. at 261-62.

Here, the predicate crime of violence for Count Five is stalking, as outlined in Count

Two.   The federal stalking statute provides:

>                     Whoever –

---

[5] The statute includes a second definition for "crime of violence" that encompasses any felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *Id.*  § 924(c)(3)(B). The Supreme Court has held that this "residual clause" is unconstitutionally vague.  *See generally United States v. Davis*, 139 S. Ct. 2319 (2019).   Thus, the parties agree that, for a charge under § 924(c)(1)(A) to be available, the predicate offense must be a crime of violence under the elements clause.  (*See* D.I. 171 at 27-28; D.I. 189 at 56 n.18)

(1) travels in interstate or foreign commerce or is present within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that –

(A) places that person in reasonable fear of the death of, or serious bodily injury to –

(i) that person;

(ii) an immediate family member (as defined in section 115) of that person; or

(iii) a spouse or intimate partner of that person; or

(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or

(2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that –

(A) places that person in *reasonable fear of the death of or serious bodily injury to a person* described in clause (i), (ii), or (iii) of paragraph (1)(A); or

(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),

shall be punished as provided in section 2261(b) of this title.

23

18 U.S.C. § 2261A (2013) (emphasis added).[6]   The government refers to the conduct in

§ 2261A(2)(A) as "cyberstalking."   (*See, e.g.*, D.I. 189 at 55)

The cyberstalking provision is divisible from the rest of § 2261A because the other

provisions in § 2261A define separate crimes.   *See, e.g., Mathis v. United States*, 136 S. Ct.

2243, 2249 (2016) ("A single statute may list elements in the alternative, and thereby define

multiple crimes.").   For example, § 2261A(1)(A) is different from § 2261A(2)(A) because

§ 2261A(1)(A) requires travel in interstate or foreign commerce, presence within the special

maritime and territorial jurisdiction of the United States, or entry into or exit from Indian

country, while § 2261A(2)(A) does not.

As a preliminary matter, the Court must address what the government concedes is a

mistake in the second superseding indictment.   As noted above, Count Two is the predicate

offense for the firearms charge in Count Five.   In the original indictment, Count Two charged

Defendants with violations of § 2261A(2)(A) *and* (B).   (D.I. 3 at 12)   Section 2261A(2)(B)

differs from § 2261A(2)(A) in that § 2261A(2)(A) requires causing "reasonable fear" of "death"

or "serious bodily injury," while § 2261A(2)(B) requires causing only "substantial emotional

distress."   Unlike the original indictment, the second superseding indictment charges

cyberstalking in violation of *only* § 2261A(2)(A), but Count Two of the second superseding

indictment still contains the now-inapplicable "substantial emotional distress" language found

only in § 2261A(2)(B).   (D.I. 106 at 12)   The government concedes that this language should

have been removed when the government decided not to charge a violation of § 2261A(2)(B).

---

[6] This version of the statute is the one that was in effect at the relevant time.   (*See* D.I.
189 at 57)   Since 2013, the statute has been amended in ways that are immaterial to this case.

(*See, e.g.*, D.I. 189 at 59) (referring to "substantial emotional distress" language as "mere surplusage")

In Oliver's view, the government should be required to obtain a third superseding indictment without the "substantial emotional distress" language.   (Tr. at 45-46)   Because the jurors may review the second superseding indictment during deliberations, Oliver is particularly concerned that they may be misled into convicting Defendants of Count Two for conduct that does not amount to a crime of violence, thereby making a conviction on Count Five improper.

The Court does not agree that it must dismiss Count Five because of a minor drafting error.   *See generally United States v. Hataway*, 933 F.3d 940, 944-45 (8th Cir. 2019) (explaining that charging document is viewed as whole, including in determining relevant portion of divisible statute).   The government indicated during the hearing that it would be amenable to redacting the "substantial emotional distress" language from the second superseding indictment before providing copies to the jury.   (Tr. at 56)[7]   Alternatively, or additionally, the Court might cure any prejudice to Defendants by instructing the jurors that Count Two contains an error and that they must disregard the "substantial emotional distress" language.   Regardless, as the government emphasizes, "the jury will be instructed only on the elements of § 2261A(2)(A)." (D.I. 189 at 59)   Under these circumstances, the second superseding indictment is sufficiently clear, notwithstanding the admitted mistake in Count Two.

The Court now turns to Oliver's principal challenge.   Oliver maintains that the

---

[7] The government noted that it was unsure of the Court's authority to redact the second superseding indictment.   (Tr. at 56-57)   This is an issue the parties should consider further as the case proceeds to trial, and they should update the Court on their views at the appropriate time.

cyberstalking provision has "no element of physical force" and, therefore, could be violated

"without any use, attempted use, or threatened use of physical force."   (D.I. 171 at 30; *see also*

Tr. at 46)   The government disagrees, arguing that "[a]n individual cannot engage in a 'course of

conduct' that puts somebody 'in reasonable fear of the death of or serious bodily injury' to a

person without engaging in conduct that, at a minimum, threatens the use of physical force."

(D.I. 189 at 60)   The Court agrees with the government.

The most relevant Third Circuit case cited by the government is *United States v. Wilson*,

880 F.3d 80 (3d Cir. 2018).   In *Wilson*, the court considered whether unarmed bank robbery by

intimidation, in violation of 18 U.S.C. § 2113(a), is a crime of violence under the U.S.

Sentencing Guidelines' elements clause, which is similar to § 924(c)(3)(A).   Joining seven other

Courts of Appeals, the Third Circuit concluded that unarmed bank robbery by intimidation

necessarily involves at least the threat of physical force, making it a crime of violence.   *See id.*

at 85.   That holding supports the government's position in this case that cyberstalking is also a

crime of violence.   Section 2261A(2)(A) requires the victim to have "reasonable fear" of death

or serious bodily injury, and Oliver has not articulated any plausible scenario in which a victim

could reasonably have such a fear without at least the threat of physical force.[8]   (*See* Tr. at 46-

47; *see also generally United States v. Lockley*, 632 F.3d 1238, 1245 (11th Cir. 2011) ("We find it

inconceivable that any act which causes the victim to fear death or great bodily harm would not

involve the use or threatened use of physical force."))

---

[8] Oliver's suggestion that the analysis would "depend on the facts and circumstances," including "what the individual . . . subjectively believes" (Tr. at 46; *see also id.* at 48), appears to contradict the required categorical approach.   *See Descamps*, 570 U.S. at 261.

Other courts have reached similar conclusions in considering state stalking statutes. For example, in *United States v. Seay*, 553 F.3d 732, 737-38 (4th Cir. 2009), the court held that felony stalking under North Carolina law is a crime of violence under the U.S. Sentencing Guidelines' elements clause. The court explicitly rejected the defendant's argument that "[c]onduct intended to cause another reasonable fear of bodily injury does not naturally include the threatened use of physical force." *Id.*; *see also id.* at 738 (noting that "[w]illfully placing a person in fear of bodily harm is inherently a threat"). In *United States v. Johnson*, 707 F.3d 655, 662 (6th Cir. 2013), the court endorsed the reasoning in *Seay*.[9]

Oliver cites three additional cases from other circuits, but none of them supports his position. First, Oliver relies on *United States v. Veal*, 138 F. App'x 902 (9th Cir. 2005), in which the defendant was convicted of violating the then-existent version of § 2261A. That case involved a pattern of behavior that culminated in the defendant showing up at the victim child's school with a picture of the child, a note to the child's teacher, and a pair of children's socks. *Id.* at 904. That course of conduct gave the child a reasonable fear that she might be kidnapped or killed, and it involved at least the threatened use of physical force.

Next, Oliver cites *United States v. Wills*, 346 F.3d 476 (4th Cir. 2003), which also upheld a conviction under the version of § 2261A that was in effect at the time. That case involved a ruse in which the defendant left a cellphone and fake fliers at the victim's door so that the victim would call the defendant, who was posing as a potential employer. *See id.* at 843-44. The

---

[9] The Sixth Circuit concluded that conduct violating Kentucky's stalking statute is not necessarily a crime of violence under the elements clause because Kentucky's statute extends beyond fear of death and serious physical injury to include fear of sexual contact. *See Johnson*, 707 F.3d at 662.

defendant lured the victim to a fake job interview, resulting in the victim's disappearance. *See id.* Because the defendant's conduct involved at least the threat of physical force (and eventually the actual use of physical force), the Fourth Circuit held that there was sufficient evidence to conclude that the victim had a reasonable fear of death or serious bodily injury before he was killed. *See id.* at 499. Neither *Veal* nor *Wills* provides an example of how a defendant may be convicted of violating § 2261A without at least the threatened use of physical force.

Third, Oliver points to *United States v. Sayer*, 748 F.3d 425 (1st Cir. 2014). In that case, the defendant was convicted of cyberstalking after he had uploaded sexually explicit photographs and videos of his ex-girlfriend to the internet. *See id.* at 428-30. The then-applicable version of § 2261A(2)(A) was broader than the version of the statute applicable in this case because, at that time, it prohibited causing "substantial emotional distress" and did not necessarily require reasonable fear of death or serious bodily injury. *See* 18 U.S.C. § 2261A(2) (2006). *Sayer*, then, does not speak to whether the narrower version of § 2261A(2)(A) requires at least the threat of physical force.

Finally, the Court recognizes that one district court has concluded that a previous version of § 2261A(1), which also required reasonable fear of death or serious bodily injury, does not meet the elements clause of § 924(c)(3). *See generally United States v. Minners*, 2020 WL 4275040, at *5-7 (N.D. Okla. July 24, 2020). That court hypothesized the following scenario in which it reasoned a defendant could be convicted of cyberstalking without the threatened use of physical force: "For example, the defendant may have had a prior relationship with the victim, so by merely telling the victim that the defendant will be in his or her area [the defendant] could

28

cause the victim a reasonable fear of death or serious bodily injury." *Id.* at *6.   In this Court's view, the hypothesized scenario ***does*** involve at least the threatened use of physical force, when considering all the circumstances.   Moreover, the version of the statute applicable here requires that the defendant intend "to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate."   It does not, therefore, reach unintentional conduct, as potentially contemplated in the *Minners* hypothetical.   If the hypothetical defendant intentionally communicates with the victim in a way that causes reasonable fear of death or serious bodily injury, that communication necessarily involves at least the threatened use of physical force.

In sum, cyberstalking, as prohibited by the relevant version of § 2261A(2)(A), is a crime of violence under § 924(c)(3)(A).   Accordingly, the Court will deny Oliver's motion to dismiss Count Five of the second superseding indictment.

## IV.    Tinnin's Motion for Severance

Tinnin moves to sever his trial from the trial of the other defendants.   (D.I. 172)   In particular, Tinnin suggests that it would be unfair for him to be tried at the same time as Pritchett. (*See id.*)   According to Tinnin, "[b]ecause of the impact of various quantity of evidence as it pertains to Pritchett, versus Tinnin," Tinnin will purportedly "have no alternative but [to] sling as much mud on his codefendant[,] resulting in almost two prosecutorial teams against one."   (*Id.* at 2)   Yet Tinnin acknowledges that "a defendant is not necessarily entitled to a severance because the evidence against a codefendant is more damaging [than] against him."   (*Id.*) (citing *United States v. Urban*, 404 F.3d 754 (3d Cir. 2005))   Tinnin falls far short of showing, as he must, there is a "serious risk that a joint trial would compromise a specific trial right."   *Shabazz*,

29

319 F. App'x at 130; *see also Zafiro*, 506 U.S. at 539 (stating court should grant severance motion "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence").

Similarly, to the extent that Tinnin seeks severance because he and Pritchett have "antagonistic defenses," Tinnin has not explained why their defenses "conflict to the point of being irreconcilable and mutually exclusive." *United States v. Provenzano*, 688 F.2d 194, 198 (3d Cir. 1982) (internal quotation marks omitted).   Presumably, Tinnin's motion is based on the notion that Tinnin and Pritchett may blame each other for any evidence found in Tinnin's apartment, to which Pritchett also had access.   But the government will not rely on any evidence obtained from Tinnin's apartment.   (*See supra* Section I.C)   Further, even if Tinnin and Pritchett were inclined to blame each other, "finger-pointing and blame-shifting among coconspirators do not support a finding of mutually antagonistic defenses." *United States v. Voigt*, 89 F.3d 1050, 1095 (3d Cir. 1996).

Moreover, judicial economy weighs heavily in favor of trying Tinnin alongside the other defendants, particularly considering that all Defendants are charged with entering into the same conspiracy. *See United States v. Eufrasio*, 935 F.2d 553, 568-69 (3d Cir. 1991).   Accordingly, Tinnin's motion for severance will be denied.

## V.      Pritchett's, Tinnin's & Bacon's Motions Regarding Rule 404(b) Evidence

Pritchett, Tinnin, and Bacon all request that the Court order the government to disclose to them any evidence falling within the scope of Federal Rule of Criminal Procedure 404(b).   (*See generally* D.I. 168, 175, 178)   During the hearing, the government informed the Court that it had

worked out a deal with Defendants: the government will notify defense counsel by November 15, 2021 of its intentions regarding any Rule 404(b) evidence, including which rap songs it believes are admissible.   (Tr. at 8-9, 50)   Defendants' counsel either confirmed that this arrangement is acceptable or did not contest the government's representation that the issue had been resolved.   (*See id.* at 41, 49-50, 59, 61, 62)   After the hearing, the Court entered an order to formalize the government's obligations under the parties' compromise.   (*See* D.I. 210)   Accordingly, the motions regarding Rule 404(b) evidence will be denied as moot.

## VI.    Motions to Join

All other defendants seek to join Oliver's motion to dismiss Count Five of the second superseding indictment (D.I. 171 Point 4) on the ground that cyberstalking, in violation of § 2261A(2)(A), is not a "crime of violence" under § 924(c)(3)(A).   (*See generally* D.I. 167, 174, 176, 177)   During the hearing, the government did not oppose the other defendants' requests to join that motion.   (Tr. at 13-14, 17-18)   Accordingly, the Court will permit all other defendants to join Oliver's motion to dismiss.

Cooper would like to join Oliver's motion (D.I. 171) with respect to the argument that the government impermissibly gathered cellphone information using tower dumps.   (Tr. at 17; *see also* D.I. 176)   During the hearing, the government stated that it did not object to any defendant joining Oliver's motion to challenge the "general tower dump orders" because those orders are not specific to any defendant.   (Tr. at 18)   Accordingly, the Court will permit Cooper to join Oliver's motion in this regard.

Tinnin also seeks to join Oliver's motion (D.I. 171) with respect to the suppression of evidence obtained pursuant to § 2703(d) orders.   (Tr. at 16-17; *see also* D.I. 174)   Tinnin's

31

counsel implied that the § 2703(d) orders relating to Tinnin are not the same as the orders relating to Oliver.   (*See* Tr. at 16-17)   In other words, Tinnin seeks different relief than Oliver does.   Additionally, Bacon filed a supplemental motion to suppress evidence obtained pursuant to certain court orders and search warrants relating to him (D.I. 186), incorporating by reference arguments in Oliver's motion (D.I. 171).   (*See* Tr. at 14-16)   Like Tinnin, Bacon seeks different relief than Oliver does.   (*Compare* D.I. 186 at 2 *with* D.I. 189 at 17)   The government objects to Tinnin's and Bacon's requests as unclear and untimely, and the Court agrees with the government.   The Court will not permit Tinnin and Bacon to challenge procedures and evidence for which no specific arguments have been articulated.   Moreover, the issue may be moot now that the Court has rejected all of Oliver's challenges to the various court orders and search warrants.   (*See supra* Section II.B)   Accordingly, with respect to the issue of suppression, Tinnin's and Bacon's motions to join will be denied without prejudice.

Finally, Oliver initially filed a motion seeking to join the other defendants' motions. (D.I. 171 at 31)   During the hearing, however, Oliver confirmed that he is no longer seeking to join any other motions.   (Tr. at 14)   Accordingly, Oliver's motion to join will be denied as moot.

## CONCLUSION

The Court will dispose of the pretrial motions in accordance with the rulings explained above.   An appropriate order follows.